FAMILY DIVISION TRIAL LAWYERS
OF the SUPERIOR COURT–D.C.,
INC., et al., Appellants,

v.

H. Carl MOULTRIE, Chief Judge, D.C.
Superior Court, et al.

No. 83–1016.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 27, 1983.

Decided Jan. 6, 1984.

David J. Ontell, Washington, D.C., for appellants.

Lutz Alexander Prager, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for appellees.

Before WALD, MIKVA and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Dissenting opinion filed by Circuit Judge STARR.

WALD, Circuit Judge:

■ This appeal is from the district court's grant of summary judgment for the defendant-appellees on the basis that the appellants failed to state a valid constitutional claim of involuntary servitude, a "taking" of property, or a denial of equal protection.[1] The appellants—three individual attorneys who regularly request assignment of cases in the Family Division of the Superior Court of the District of Columbia for which the District pays attorney fees and an association of lawyers who practice before the Family Division—challenged the practices by which the superior court appoints counsel to represent indigent parents in neglect proceedings without reimbursement of any kind. The district court rejected the appellants' challenges to these practices on the basis of their facial unconstitutionality, and further held that the appellants' failure to formally and specifically take issue with the appellees' statement of material facts in their cross-motion for summary judgment justified granting that motion with regard to the constitutional challenges based on the operation of the assignment system. While we agree that the superior court's assignment system is not unconstitutional on its face, we reverse, in part, because we find that the district court erroneously concluded that no material issue of fact was involved as to the claim that the system's effect in practice is so burdensome on a small segment of the bar as to constitute a violation of those lawyers' fifth amendment rights.

## I. BACKGROUND

### A. The Appointment Practices

Since 1970, the D.C.Code has provided that in child neglect and parental termination proceedings[2] both parents and children

---

1. Equal protection applies to the District of Columbia as part of the fifth amendment's guarantee of due process of law. *See Bolling v.*

*Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

2. We will henceforth use the term "neglect proceedings" to include "proceedings to termi-

must be provided with appointed counsel if the parents are financially unable to obtain adequate representation. The relevant statute reads:

(1) When a child is alleged to be neglected or when the termination of the parent and child relationship is under consideration, the parent, guardian or custodian of the child named in the petition or in a motion to terminate is entitled to be represented by counsel at all critical stages of the proceedings, and, if financially unable to obtain adequate representation, to have counsel appointed in accordance with rules established by the Superior Court of the District of Columbia.

(2) ... The Division shall in every case involving a neglected child which results in a judicial proceeding, including the termination of the parent and child relationship ..., appoint a guardian ad litem who is an attorney to represent the child in such proceedings.[3]

Until October 1, 1982, no funds were available to pay counsel appointed to represent indigent parents in neglect cases.[4] Since then, limited funds have been appropriated for this purpose.[5] Presently, counsel for both children and parents in neglect proceedings are paid $30 for each court appearance. Attorney compensation, however, is subject to the following limits: $100 per child-neglect case until disposition of the

neglect petition; $60 for each review of a child-custody placement pursuant to a finding of neglect if the review is within two years of the original neglect disposition or if the child is under 6 years old; $30 for all other reviews; $100 for termination proceedings. Letter from the Honorable Gladys Kessler, *supra* note 4. No funds are provided for expert witnesses or investigative services.

Superior court rules implementing the statutory mandate that counsel be appointed to represent indigent parents provide:

Assignment of counsel shall be made by the Division from a list of attorneys prepared and maintained by the Division. Separate counsel shall be assigned to represent a child alleged to be neglected and his parents, guardian or custodian whenever they are financially unable to obtain adequate representation. In cases where the child and his parents, guardian or custodian are financially able to obtain adequate representation but have not retained counsel, the Division may appoint separate counsel and order the payment of reasonable attorneys' fees in accordance with SCR-Neglect 27 or may appoint counsel for the child and direct his parents, guardian or custodian to retain private counsel for themselves within a specified period of time. In making appointments the Division shall wherever possi-

---

nate the parent-child relationship" unless we specify otherwise.

**3.** D.C.Code Ann. § 16–2304(b) (1981). This provision was enacted in 1977 as D.C. Law 2–22, published at 24 D.C.Reg. 727, 767 (July 22, 1977). Earlier congressional legislation substantially to the same effect can be found at D.C.Code § 16–2304 (1973) (enacted in 1970).

**4.** As for counsel appointed to represent parents, the D.C.Code authorized no money to pay children's counsel until June, 1982, *see infra* note 5, and no local funds were actually provided until October, 1982. *See* Letter from the Honorable Gladys Kessler, D.C. Superior Court Judge, Family Division, to Family Division attorneys (Sept. 29, 1982) (discussing funds for appointed counsel in neglect cases). According to the appellants' uncontested statement, however, from January, 1980, until local funds were appropriated in October, 1982, attorneys appointed to represent children of indigent par-

ents were paid $30 per hearing, without any limit on total payment, under Health and Human Services grant CA 90–2036. *See* Brief for Appellants at 19.

**5.** *See* Letter from the Honorable Gladys Kessler, *supra* note 4. These funds were authorized by an amendment to D.C.Code § 16–2304 (Supp.1983), which provides:

(c) Prior to appointment of counsel under this section, the eligibility of a child or other party to be represented by counsel shall be determined by the Division pursuant to rules established by the Superior Court of the District of Columbia.

(d) There are authorized to be appropriated such funds as may be necessary for the administration of this section.

D.C. Law 4–114, published at 29 D.C.Reg. 1699, 2521 (Apr. 23, 1982 and June 18, 1982).

ble obtain the same attorneys, if any, who represented the child and the child's parents, guardian or custodian in previous appearances before the Division.

D.C. S.C.R.-Neglect 20(b). In practice, counsel are appointed to represent indigent parents from a list of lawyers who, during the previous month, have requested assignments of juvenile delinquency cases for which compensation is provided under the District of Columbia's Criminal Justice Act (CJA).[6] This list is maintained by the D.C. Public Defender Service.

When an attorney registers for compensated CJA work in the Family Division, he is notified that he may be appointed to neglect cases on a *pro bono publico* basis. Affidavit of W. Anthony Fitch, Deputy Director of the Public Defender Service for the District of Columbia (Oct. 20, 1982). The Public Defender Service and the judges of the superior court repeatedly warn attorneys that they will not be appointed to CJA-compensated cases if they do not also agree to represent indigent parents in neglect proceedings.

B. *The Superior Court Proceeding*

David Sitomer, an individual attorney-appellant in this case, as the appointed attorney for parents in two neglect proceedings, filed a motion in superior court seeking administrative relief and compensation for services. He alleged that his uncompensated appointment as parents' counsel in many neglect proceedings was confiscatory and an unconstitutional "taking" of his property without just compensation. *See In the Matters of N.P. and L.W.,* Nos. 404–79, 418–79 (D.C.Super.Ct. June 14, 1982). Superior Court Judge Block ordered Sitomer

to present evidence on how the appointment system in neglect cases actually worked and what its effect on appointed lawyers was. Judge Block also denied petitions to intervene in the proceeding filed by thirteen other lawyers, including the two individual appellants in this case, and by Sitomer in his capacity as President of the Family Division Trial Lawyers Association. Addressing Sitomer's individual claim, the court concluded that "it simply cannot be said that Mr. Sitomer's neglect caseload was so excessively burdensome that he was compelled to foresake his regular law practice. Likewise the evidence relating more generally to the practices of the Family Division does not reveal a system so noxious as to violate Mr. Sitomer's constitutional rights." *Id.* at 3–4. Although Judge Block found no violation of Sitomer's constitutional rights, he did find the practice by which counsel for parties in neglect cases is appointed was inadequate and unfair in several respects:

> While it is obvious that this practice has been bureaucratically expedient, it is just as clear that it has insured neither the delivery of the appropriate level of representation to all parties in neglect actions nor equitably distributed the burdens of *pro bono* representations among those attorneys who practice before the Family Division. Accordingly, the neglect appointment list should be expanded beyond its present scope.

*Id.* at 5.

Initially, Sitomer appealed the superior court decision denying him relief, but later voluntarily abandoned that appeal claiming he could not afford a transcript and other costs of the appeal. The other appellants

---

**6.** D.C.Code Ann. §§ 11–2601, 2602, 2604 (1981). Until November, 1983, the CJA-compensated attorneys were paid $30 per hour for court appearances, and $20 per hour for out of court work, subject to limitations of $400 per misdemeanor, $1000 per felony, and $250 per post-trial motion. *See* D.C.Code Ann. § 11–2604 (1981) (adopting by reference compensation set by national CJA, 18 U.S.C. § 3006A(d)(1), (d)(2)). Presently, CJA-compensated attorneys receive $35 per hour for work both in and out of court, subject to limits

of $900 per misdemeanor, $1700 per felony, and $900 per post-trial motion. *See* District of Columbia Criminal Justice Act Amendments Act of 1983, D.C.Reg. 5411–12 (Oct. 21, 1983). Also the local CJA has always provided for costs of investigation, expert witnesses and other services necessary for an adequate defense. *See* D.C.Code Ann. § 11–2605; D.C. Reg. 5412 (Oct. 23, 1983). CJA-compensated cases are thus appreciably more lucrative than appointed neglect cases.

appealed the district court's denial of intervention but they too abandoned their appeals claiming insufficient funds to cover court costs. *See* Order Dismissing Appeals, *In re N.P., Jr.,* No. 82–908 (D.C.Ct.App. Aug. 14, 1983); Motion to Withdraw Appeal, *In re N.P., Jr.,* No. 82–908 (D.C.Ct. App. June 15, 1983).

### C. *The District Court Decision*

Before moving to withdraw their appeals in the D.C. Court of Appeals, Sitomer and the other lawyers, along with the Family Division Trial Lawyers Association, filed a new complaint in federal district court alleging that the practices by which the superior court assigns counsel to represent parents in neglect proceedings constitutes involuntary servitude and a "taking" of property without just compensation because it requires attorneys to work for nothing. They also claimed that placing the burden of representing indigent parents exclusively on Family Division attorneys who depend on CJA-compensated cases rather than spreading it among other D.C. bar members or even other non-Family Division CJA-compensated attorneys amounts to so disproportionate a burden as to constitute a "taking" as well as a denial of equal protection of the law, in violation of the fifth amendment. The appellants seek damages for past financial losses for uncompensated appointments and an injunction against further inadequately compensated appointments.

The district court dismissed the thirteenth amendment and "taking" claims stating, first, that compelled public service is not, in and of itself, involuntary servitude, even when imposed on a limited segment of the population. Specifically, requiring attorneys to take *pro bono* cases is neither involuntary servitude nor a *per se* "taking."

The district court acknowledged, however, that if a system of compulsory assignments without pay sufficiently burdened individual attorneys so that their ability to earn a livelihood was endangered, it could constitute a prohibitive "taking" of property. The court, however, noted that Local Rule 1–9(h) allows a court to "assume that the facts as claimed by the moving party in his statement of material facts are admitted to exist except as and to the extent that such facts are controverted in a statement filed in opposition to the motion." D.D.C. Civ.R. 1–9(h). Because the appellants filed no specific refutation of the material facts cited in the appellees' motion for summary judgment—that "neglect cases do not usually require substantial … efforts," and "the burden placed on an attorney by neglect appointments does not impair the attorney's ability to engage in remunerative practice"—and because the appellants' cross-motion for summary judgment, filed in lieu of the opposition required by Rule 1–9(h), did not specifically allege that the superior court appointment system unduly burdened them, the district court granted the appellees' motion for summary judgment on the "taking" issue. *See Family Division Trial Lawyers of the Superior Court of the District of Columbia, Inc. v. Moultrie,* No. 82–1373, slip op. at 7–8 (Dec. 20, 1982).

Finally, the district court held that the appellants' complaint did not state a claim for violation of the equal protection clause. It reasoned that "it is entirely rational to select lawyers who have expressed an interest in Family Division appointments to take on neglect cases; lawyers who request appointment to Family Division actions may be presumed to be more experienced in family legal issues and therefore may be presumed capable of providing more skilled counsel." *Id.* at 10.

## II. ABSTENTION

In addition to their argument that the grant of summary judgment in their favor was correct, the appellees also maintain that the district court should have abstained from deciding the merits of the appellants' claims at all. The appellees say that any federal court decision in this case directly interferes with and undermines local judicial proceedings involving important "state" interests in which the appellants'

constitutional claims could have been raised and adequately dealt with. They argue that the progeny of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), applying its principle of equitable abstention by federal courts to civil as well as criminal proceedings in state courts, should control here.[7] We agree, in the main, with appellees' position that in the great majority of cases local courts should be free to follow their own schemes of judicial administration, unfettered by directives from the federal courts. However, local judicial administration is not immune from attacks in federal court on the ground that some of its practices violate federal constitutional rights. *See District of Columbia Court of Appeals v. Feldman,* —— U.S. ——, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) (claim that D.C. bar admission requirement that applicants graduate from an accredited law school is unconstitutional presents a federal question). In this case, we find that the *Younger* abstention doctrine, developed to prevent undue federal court interference in local judicial administration, does not apply to bar the district court's consideration of the appellants' constitutional challenges.

*Younger* held that a federal court should abstain from entertaining suits raising constitutional issues if the federal plaintiff is a defendant in a pending state criminal proceeding and the defendant can raise those issues in state court as defenses to his prosecution. Federalism and comity lie behind *Younger:* federal courts should respect state courts' abilities to adjudicate federal constitutional rights where adjudication of those rights will arise normally in the course of the pending state court proceeding. *See Trainor v. Hernandez,* 431 U.S. 434, 441, 97 S.Ct. 1911, 1916, 52 L.Ed.2d 486 (1977). Permitting federal courts to entertain separate suits involving these federal claims while the state action is pending would not only result in duplicative legal proceedings but might produce the uncomfortable spectacle of federal injunctions prohibiting a state from enforcing its own criminal law or the decisions that emanate from its own state courts. *See Huffman v. Pursue, Ltd.,* 420 U.S. 592, 602–03, 95 S.Ct. 1200, 1207–08, 43 L.Ed.2d 482 (1975) (citing *Steffel v. Thompson,* 415 U.S. 452, 462, 94 S.Ct. 1209, 1217, 39 L.Ed.2d 505 (1974)); *Kaplan v. Hess,* 694 F.2d 847, 851 (D.C.Cir. 1982). The only justification for federal court interference during a state proceeding would be a premise that the state courts cannot be trusted to adequately protect federal constitutional rights, a premise unequivocally rejected by the *Younger* Court. *See Middlesex County Ethics Committee v. Garden State Bar Assoc.,* 457 U.S. 423, 431, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982); *Kaplan,* 694 F.2d at 851.

Since its promulgation, the *Younger* doctrine has been extended beyond criminal proceedings to cover pending civil actions in state courts. It is noteworthy, however, that virtually all post-*Younger* cases have involved collateral attacks in federal court on state enforcement proceedings *brought against the federal plaintiff.*[8] Thus, *Huffman,* 420 U.S. 592, 95 S.Ct. 1200, upon which the appellees heavily rely, involved an attack in federal courts on the constitution-

---

**7.** Neither the Supreme Court nor this court has yet decided whether *Younger* abstention, premised to a large extent on federalism, should be applied to D.C. courts, as well as state courts. *See Pernell v. Southall Realty,* 416 U.S. 363, 368 n. 4, 94 S.Ct. 1723, 1726 & n. 16, 40 L.Ed.2d 198 (1974); *Spivey v. Barry,* 665 F.2d 1222, 1229 & n. 16 (D.C.Cir.1981). Since we decide today that this case falls outside the substantive scope of the *Younger* doctrine, we too put this question off for a while longer.

**8.** An exception is *Parker v. Turner,* 626 F.2d 1 (6th Cir.1980), which held that a federal court could not enjoin alleged unconstitutional practices of state juvenile judges in failing to ap-

point counsel for indigent fathers in child support suits. *Parker* relied on an alternative rationale in *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1973), which stated that a federal district court should not ordinarily consider a constitutional claim where relief for that claim would require day-to-day monitoring of state court judges. We believe *Parker* stretches beyond *O'Shea,* however, in refusing to consider constitutional challenges to regularized local court practices like failure to appoint counsel whose relief would not require the kind of oversight of inherently discretionary decision-making practices, like setting bail and parole, involved in *O'Shea.*

ality of a state nuisance statute used to shut down theatres showing obscene movies, where the state had already brought an action under that statute to close the theatres. Similarly, *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), involved a collateral attack on the constitutionality of civil contempt proceedings brought by the state against judgment debtors who disobeyed subpoenas. *See also Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (refusing to decide the constitutionality of a state attachment proceeding brought to recover money from public assistance recipients who allegedly concealed assets).

There is good reason why the *Younger* abstention policy is best suited to cases where federal plaintiffs are trying to attack state enforcement procedures which have been directly applied to them. For, in such cases, the state has brought the federal plaintiffs before its own courts to protect important policy and resource interests and in such cases the plaintiffs' federal action are perceived as attempts to divert or circumvent state court adjudication. The need or wisdom of extending *Younger* to all constitutional claims that *might* be adjudicated in state as well as federal courts, however, is far more problematical. This extension would make federal courts cinderellas to their sister state courts in adjudicating federal constitutional rights, their native area of competence and jurisdiction. And it would prevent plaintiffs from exercising their traditional choice of bringing constitutional claims in either forum, even where there is no strong state interest in how or where the claims are decided. *See Steffel v. Thompson*, 415 U.S. at 462–63, 94 S.Ct. at 1217–18; *Monroe v. Pape*, 365 U.S.

167, 183, 81 S.Ct. 473, 481, 5 L.Ed.2d 492 (1961).

*Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979), represents the outer limit to which the Supreme Court has extended *Younger* abstention. *Moore* held that a federal court should not entertain a parent's constitutional challenge to the state practice of removing suspected child abuse victims from parental custody without notice pending a hearing on the abuse charge. While the parent's challenge to the interim removal procedure was not technically a defense to any charge of child abuse, the temporary removal policies were inextricably tied up with the state interest in protection of its children, the very *raison d'etre* for the abuse proceedings. *See Moore*, 442 U.S. at 430 n. 12, 99 S.Ct. at 2380 n. 12 (claiming that hinging abstention doctrine on whether federal issue is a "defense" to state proceeding is a mere "semantic joust"). And, there was no question the parents could raise the constitutional issue in the course of their abuse proceedings.

This case falls outside the *Moore* perimeters, and hence we find abstention to be inappropriate. Except for Sitomer, the plaintiff-appellants were not parties to any pending suit in the local courts in which their constitutional challenges could naturally be resolved.[9] The District has brought no proceedings against any of these appellants. This alone distinguishes the case from the reach of *Younger* situations. *See, e.g., Kaplan v. Hess*, 694 F.2d at 851 (*Younger* not applicable because no pending proceeding in case where appellants challenged a local court rule requiring them to stand when judges enter or leave the courtroom); *New Jersey-Philadelphia Presbytery of the Bible Presbyterian Church v. New*

---

9. Because Sitomer was allowed to and did press his constitutional claim in the superior court, *res judicata* bars his federal claim. *See* discussion of Sitomer's claims *infra*, part III.

The appellees suggested at oral argument that *Younger* should apply to all the appellants despite the lack of a pending state suit because here, as in *Huffman*, 420 U.S. at 610, 95 S.Ct. at 1211 the appellants voluntarily dismissed their local appeal. Except for Sitomer, however, the

parallel does not fit. Unlike the appellants in *Huffman*, appellants here were not "losing part[ies]" in the state court ... [who] believe that [their] chances of success are not auspicious." *Id.* Rather, appellants' claims on the merits were never heard: the superior court ruled their claim must be brought as a separate lawsuit; they apparently agreed and elected to sue in federal court, an election which they were entitled to make.

*Jersey State Board of Higher Education,* 654 F.2d 868 (3d Cir.1981) (*Younger* did not bar non-parties to state enforcement proceedings against unlicensed college's operation from bringing federal suit to enjoin state from continuing enforcement efforts); *see also Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (plaintiffs who refrained from criminal activity—employing topless dancers—are not barred by *Younger* from bringing a federal challenge to the criminal statute, although other plaintiffs who committed the crime, and who were represented by common counsel, with similar business activities and problems were barred by pending state criminal proceedings). In addition, the individual neglect cases in which the appellants are counsel are questionable vehicles at best for raising their constitutional claims. The local court here has already said so when it denied intervention by other attorneys in Sitomer's proceeding. It noted:

> By their very nature neglect proceedings contemplate issues centering on the care of a child by his or her parent. If need be "related matters involving the same family or household" can be consolidated. SCR-Neglect 2 & 3(b). Anything broader is inconsistent with the nature of the proceedings.
>
> Mr. Sitomer's claims touched on issues affecting his representation of parties in the above-captioned cases, but intervention by other attorneys would completely separate the cases from their roots in the original complaints of neglect. *In this instance we have already strained the bounds of the neglect proceeding* and we cannot allow it to bear the burden of what would amount to an informal class action. Moreover, *the Court notes that, in fact, a class action suit has been filed recently in U.S. District Court. That suit will surely provide a better forum for presenting the claims of the attorneys than can be obtained by any bootstrapping efforts here.*

*In the Matters of N.P. and L.W.,* slip op. at 2–3 (emphasis supplied). Consistent with the superior court's reasoning, we find that *Younger* does not apply to bar claims that

are so ancillary to arguably related local court proceedings that even the local court finds the claims disruptive of the resolution of core issues in those proceedings.

Appellees additionally contend that any relief for the appellants would require the federal courts to interfere in the superior court administration of appointment of counsel in neglect cases. Therefore, even if *Younger* abstention is technically inapposite, the district court should stay its hand in this case under the principle discussed in *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), that a federal district court should not consider a claim where granting the prayer for relief would require the federal court to monitor day-to-day operations of the local courts.

This case, however, is very different from *O'Shea.* There, the plaintiffs—citizens of Cairo, Illinois, who organized and participated in an economic boycott of merchants purportedly engaged in racial discrimination—alleged a pattern and practice of racial discrimination in discretionary judicial conduct, including sentencing and setting bail, by a state judge and magistrate. The Court held that the plaintiffs had no standing to sue for injunctive relief since their claim asked the Court to presume future constitutional violations against them by state judicial officers. In addition the Court stated that any injunctive relief would violate the rationale of *Younger* since it would require federal courts to monitor the *day-to-day* operation of state judicial proceedings. *Id.* at 501–02, 94 S.Ct. at 678–79. The federal court would have had to directly review the state judge's and magistrate's decisions to see if they abused their discretion whenever they sentenced one of the plaintiffs, or set bail in a case involving a plaintiff. In this case, the appellants challenge a non-discretionary method of appointing uncompensated counsel because that method allegedly confiscates their opportunity to practice law. Although the challenged method is established by neither statute nor written rule, it indisputably operates more like a rule, a custom or a usage known to all participants in the

system, than a decision left to the local judiciary's discretion to be exercised on a case-by-case basis. It follows that if the rule is adjudicated to be unconstitutional, relief can be effected by requiring the superior court to adopt another "rule" which more equitably divides the financial burdens attendant to provision of counsel for indigent parents in neglect proceedings. There is no foreseeable need for any "monitoring" of its day-to-day operations. So, even if the *O'Shea* "monitoring" rationale were sufficient by itself to justify abstention, it would not apply here.

In sum, we are not unmindful of the District's stance that it has an important local interest in its neglect proceedings, *cf. Moore,* 442 U.S. at 423, 99 S.Ct. at 2377 and that attorney-assignment practices initiated and administered by its judiciary play an important role in its scheme to enforce its neglect laws. But, that interest standing in isolation is not sufficient to block a federal court from considering a claim that the practices operate in an unconstitutional manner to burden unduly or unfairly a small segment of the bar. *See Feldman,* 103 S.Ct. at 1316. In considering the merits of appellants' claims we see no potential for duplicative litigation, nor for irreverence toward the local courts, and no necessity that relief need interfere with the day-to-day operation of the superior court. Like the district court, we find abstention inappropriate in this case.

## III. Sitomer's Claims

■ We turn now to the merits of the summary judgment decision by the district court. We consider Sitomer's claims first. Sitomer has already brought and lost an

action in superior court which adjudged on the merits several of the issues raised in this case. That court found that Sitomer suffered no constitutional injury prior to filing this suit. Hence, his claim for damages due to allegations that these past appointments abridged his constitutional rights is barred by *res judicata. See Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *cf. Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (applying collateral estoppel).

Whether *res judicata* also bars Sitomer's broader claims that the system is so unfair it inherently infringes on his constitutional rights, and therefore that he should receive no future neglect appointments, is a tougher question. While we might hesitate to invoke *res judicata* to bar Sitomer from litigating claims about future appointments that he could have brought but did not,[10] here the superior court judge actually entertained and rejected such claims. It found that the appointment practices of the Family Division are not generally "so noxious as to violate Mr. Sitomer's constitutional rights."[11] *See In the Matters of N.P. and L.W.,* slip op. at 4. Therefore, we hold that all of Sitomer's claims are barred by *res judicata.*

## IV. Constitutional Claims

### A. *The Thirteenth Amendment*

■ The other appellants seek to invalidate under the thirteenth amendment judicial appointments of counsel to represent parties where neither the parties nor the state adequately compensate the appointed attorneys for their services.[12] The

---

10. *Cf. Rouch v. Teamsters Local Union No. 688,* 595 F.2d 446, 449, 451 (8th Cir.1979) (*res judicata* applies to claim defined by "operative facts," but may bar claims based on unpleaded incidents that are part of a continuing course of conduct).

11. In fact, prior to so finding, it had relieved Sitomer from his obligation to represent parents for no compensation in 17 active neglect cases. *See In the Matters of N.P. and L.W.,* No. 464–79, slip op. at 11 (Feb. 24, 1981). Si-

tomer is not entitled to a second bite at the apple, especially since his first bite yielded fruit.

12. We note that at the time appellants first filed their complaint, they received no compensation for representing indigent parents in neglect proceedings, while presently they receive limited compensation. Although this change could affect the final outcome of the case on the merits, we do not believe it moots the legal issues in this case. Severely inadequate pay,

system by which the superior court appoints counsel to represent indigent parents, however, is not forced labor. An attorney who wishes to take no further assignments is free to either stop practicing before the Family Division, or even to continue to practice without taking CJA-compensated juvenile cases. Inability to avoid continued service is the essential ingredient of involuntary servitude. *See Flood v. Kuhn*, 443 F.2d 264 (2d Cir.1971), *aff'g* 316 F.Supp. 271 (S.D.N.Y.1970), *aff'd on other grounds*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); *Wicks v. Southern Pacific Co.*, 231 F.2d 130, 138 (9th Cir.1956), *cert. denied*, 351 U.S. 946, 76 S.Ct. 845, 100 L.Ed. 1471 (1956). Since the superior court appointment system lacks this ingredient, we agree with the district court that the appellants' complaint fails to raise a genuine thirteenth amendment issue.

B. *"Taking" of Property Without Just Compensation*

The district court also rejected appellants' constitutional claim that requiring an attorney to perform traditional *pro bono* service amounts to a "taking" of property. The leading case, *United States v. Dillon*, 346 F.2d 633 (9th Cir.1965), *cert. denied*, 382 U.S. 978, 86 S.Ct. 550, 15 L.Ed.2d 469 which the district court cited, makes clear the rationale behind the traditional service exception:

> The obligation of the legal profession to serve indigents on court order is an ancient and established tradition, and . . . appointed counsel have generally been compensated, if at all, only by statutory fees which would be inadequate under just compensation principles, and which are usually payable only in limited types of cases. Further, . . . the vast majority of the courts which have passed on the question have denied claims of appointed counsel for nonstatutory just compensation, pointing out that representation of indigents under court order, without a fee, is a condition under which lawyers are licensed to practice as officers of the

court, and that the obligation of the legal profession to serve without compensation has been modified only by statute. An applicant for admission to practice law may justly be deemed to be aware of the traditions of the profession which he is joining, and to know that one of these traditions is that a lawyer is an officer of the court obligated to represent indigents for little or no compensation upon court order. Thus, the lawyer has consented to, and assumed, this obligation and when he is called upon to fulfill it, he cannot contend that it is a "taking of his services."

*Id.* at 635; *see also DeRodulfa v. United States*, 461 F.2d 1240, 1256 (D.C.Cir.1972) (dicta), *cert. denied*, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220; *Williamson v. Vardeman*, 674 F.2d 1211, 1214 (8th Cir.1982); *White v. United States Pipe & Foundry Co.*, 646 F.2d 203, 205 & n. 3 (5th Cir. Unit B 1981). In this case, the argument that *pro bono* appointments are not *per se* "takings" is bolstered by the repeated emphasis by the D.C. Public Defender Service and the superior court that CJA-compensated appointments open the appointed attorneys to the possibility of assignment of cases for no pay. Hence, appellants cannot now maintain that they had an expectation rising to the level of a property right that they would be compensated for their services. Although appellants do make a token claim that any uncompensated service required would be unconstitutional, we do not subscribe to such a position. Thus, there is no facial unconstitutionality to the statute or rules that require appointments in uncompensated cases.

While we agree with the district court that some *pro bono* requirements do not constitute a "taking," we think it equally clear that an unreasonable amount of required uncompensated service might so qualify. As the scope of the constitutionally mandated right to counsel has expanded, and the concomitant burden of providing *pro bono* representation imposed on attorneys has grown, several state courts have

like no pay, could cause hardships which give rise to valid constitutional claims.

recognized that at some point the burden on particular attorneys could become so excessive that it might rise to the level of a "taking" of property. *See, e.g., People ex rel. Conn. v. Randolph,* 35 Ill.2d 24, 219 N.E.2d 337 (1966); *Bias v. State,* 568 P.2d 1269 (Okla.1977); *State ex rel. Partain v. Oakley,* 227 S.E.2d 314 (W.Va.1976); *cf. Menin v. Menin,* 79 Misc.2d 285, 359 N.Y.S.2d 721 (Sup.Ct.1974) (appointment of counsel in civil case not mandated since such appointment would abridge appointed attorneys' property rights). And, although the appellants here have no expectation of compensation for their services in appointed cases that rises to the level of a property interest, "the right to conduct a business and enter a profession is considered a property right within the meaning of various constitutional provisions." *Menin,* 359 N.Y.S.2d at 729; *see also Board of Regents v. Roth,* 408 U.S. 564, 574, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) (if state denied terminated professor opportunity for all other public employment in state university, that might violate due process clause); *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (due process applies to bar licensing, since that is state's

grant of permission to engage in the occupation of lawyer); *Joint Anti Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 185, 71 S.Ct. 624, 655, 95 L.Ed. 817 (1951) (due process applies to denials of opportunity for future government employment). Thus, while the District may enact regulations that affect property interests, where those regulations unreasonably "frustrate distinct investment-backed expectations" they may "amount to a 'taking.'" *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 127, 98 S.Ct. 2646, 2660, 57 L.Ed.2d 631 (1978) (citing *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922)). In short, if the superior court appointment system effectively denies the appellants the opportunity to maintain a remunerative practice as family lawyers before the Family Division, and that specialty practice is determined to be a "property" interest, it might effect an unconstitutional "taking." [13]

 The dissent and appellees argue that "as a matter of law . . . no level of burdensomeness could rise to the level of a taking as long as appellants have volun-

---

**13.** Of course, the state, in the reasonable exercise of its police power, may frustrate even expectations that rise to the level of a property interest. *See PruneYard Shopping Center v. Robins,* 447 U.S. 74, 82, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980) (state could eliminate shopping center owner's "right to exclude," even though that is "one of the essential sticks in the bundle of property rights"); *Kizas v. Webster,* 707 F.2d 524 (D.C.Cir.1983) (expectations established by government employment program not protected by "takings" clause); *cf. West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 392, 57 S.Ct. 578, 582, 81 L.Ed. 703 (1937) (minimum wage laws not violative of freedom to contract because they are reasonable regulations imposed in the interests of the community). But that is not what is involved here. Here, unlike *Kizas,* the government is not merely contracting for employees' services which it is free to use or to decline, but rather is allegedly appropriating for itself in the existing market the services of certain lawyers to a degree that their *economic survival in that market* is threatened: The District has a constitutional obligation to provide counsel in juvenile delinquency cases and many neglect cases, *see Lassiter v. Dep't of Social Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1982)

(neglect); *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (delinquency), and is allegedly meeting that obligation by requiring Family Division lawyers to give their services for little or no pay. "In takings law, a direct government takeover long has been a key indicium of compensation." Rodgers, *Bringing People Back: Toward a Comprehensive Theory of Takings Law,* 10 Ecology L.Q. 205, 234 (1982); *see also* Sax, *Takings and the Police Power,* 74 Yale L.J. 36, 62–67 (1974); *cf.* Costonis, *Presumptive and Per Se Takings: A Decisional Model for the Taking Issue,* 58 N.Y.U. L.Rev. 465, 486–87 (1983) ("the taking determination depends on whether a linkage exists between the purpose of a measure and the use of the affected property establishing that the proprietor has not been unfairly singled out to bear losses that should be distributed among the public generally"); Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law,* 87 Harv.L.Rev. 1165, 1184 (1967) ("one incontestable case for compensation (short of formal expropriation) seems to occur when the government deliberately brings it about that its agents, or the public at large, 'regularly' use . . . a thing which theretofore was understood to be under private ownership").

teered their services." Diss.Op. at 713; *see also* Brief for Appellees at 22–27. The dissent is anchored in the circumstance that "only by their voluntarily seeking compensated cases were they [the Family Division lawyers] then required to take on uncompensated cases." Diss.Op. at 713. Although proving a "taking" in a situation like this one is obviously a formidable task, we are not willing at this point to rule it out as a matter of law. A "taking" might occur if the following crucial findings were made: First, the attorneys' expectations of pursuing the specialty practice of family law would have to be shown to be sufficiently established within the norms and traditions of legal practice to constitute a property interest. The dissent takes umbrage at the notion that a protected interest in a specialty practice could ever be legally recognized, although it admits that the practice of law generally might so qualify. *See* Diss.Op. at 714. We fail to see any inherent reason why the practice of law is protected by the takings clause but the practice of a legal specialty could *never* be protected. Surely, for instance, it is at best questionable whether the District could declare that henceforth all lawyers practicing before the Family Division may not accept any fees or compensation at all. We rule today only that the existence of a property interest in such practice is a matter calling for material factual development and argument in the district court, not one to be decided by appellate fiat in the absence of any record whatsoever. Second, the number of Family Division cases where the parties can pay for their own counsel would have to be limited enough so that withdrawing from the market of government compensated cases would effectively be a decision to withdraw altogether from practice before the Family Division,[14] contrary to the appellees' and dissent's suggestion

that the appellants would be "free to decide whether to conform to the proposed specifications or withdraw from the government market." *See* Brief for Appellees at 23 (quoting *Control Data Corp. v. Baldridge*, 655 F.2d 283, 293 (D.C.Cir.1981)); *see also* Diss.Op. at 713. Finally, the assignment of uncompensated neglect cases attached to "volunteering" for CJA-compensated cases would have to be so burdensome that it effectively denies the appellants' ability to earn a living by practicing family law. The record is obviously not sufficiently developed at this point to allow such findings either to be made or entirely discounted.

The district court ruled for the appellees because it found that the appellants never alleged that the appointment system was sufficiently burdensome to prevent them from engaging in a remunerative practice. It did acknowledge that if the burden the neglect appointments imposed on the appellants was heavy enough their constitutional claims might be valid, but it relied on the appellees' assertions in their Statement of Material Facts that "neglect cases do not usually require substantial research and investigation and most of the time is waiting time attributed to paying CJA cases," *Family Division Trial Lawyers*, slip op. at 7–8, to support its factual conclusion underlying summary judgment, that the burden "does not impair the attorney's ability to engage in remunerative practice." *Id.* Our reading of the record, however, does not support the district court's conclusion that the linchpin fact of nonimpairment was not truly in contest.

■ The district court relied for that critical finding on the lack of a formal contravention to the appellees' Statement of Material Facts, as required by Rule 1–9(h). The appellants' failure, however, to file such a piece of paper is understandable,

---

**14.** Although the record at this stage is silent on the proportion of cases in which parties pay for counsel, the Court System Study Committee noted that "[t]he majority of youth passing through the Superior Court Family Division ... comes from financially indigent families." D.C. Court System Study Committee of the D.C. Bar, Juvenile and Child Neglect Report

154–55 (Dec. 17, 1980) [hereinafter cited as Neglect Report]. Thus, it seems quite possible, if indeed not probable, that there are too few non-CJA-compensated cases to make viable a choice to practice before the Family Division without signing-up on the list from which *pro bono* neglect case appointments are made.

in part at least, in view of the circumstance that the district court, *sua sponte,* ordered the parties to file cross-motions for summary judgment by a fixed date. Apparently, *both parties* assumed that the cross-motions would serve as a sufficient indication of what, if any, issues of material facts were still at issue.[15] We are therefore reluctant to affirm a grant of summary judgment based on a key fact which we believe to have been at issue, but which the district court found to be uncontroverted on the technical ground that the appellants had not complied with Rule 1–9(h), where there is evidence that both parties believed they were permitted to file only simultaneous cross-motions, not responsive pleadings.

It is true that the appellants' own Statement of Material Facts did not specifically allege an unreasonable burden resulting from the assignment system, and that its formal motion for summary judgment repeated the boilerplate that there was no issue of material fact to be decided. We are also at a loss to understand why the appellants agreed at all to file cross-motions for summary judgment when the crux of their "taking" and equal protection claims hinged on the factual issue of how heavy a burden had been imposed on them. Nonetheless, in the final analysis, we cannot in good conscience square the district court's

finding that the appellants "nowhere controverted" the appellees' assertion that the neglect appointment system did not impose an undue burden with the record of the case before us, particularly when the appellants' Points and Authorities in Opposition to Defendants' Motion for Summary Judgment spent most of its ten pages contesting that critical fact.[16] Moreover, similar documents in the record reveal that the key fact of whether the Family Division Lawyers were unduly burdened was not only at the heart of this case, but was hotly contested from the start. *See, e.g.,* Complaint at 7–8 ("the burden of representation has driven many attorneys to abandon juvenile practice"); Points and Authorities in Support of Plaintiffs' Motion For Summary Judgment, at 7 ("[t]he burden for some lawyers is staggering"). No one reading these papers could come away with the impression that the appellants did not generally claim that the sheer number of nonpaying appointments was a great financial burden on them, or that if the burden was not perceived to be great, the case would have been brought in the first place.

But there is a more fundamental reason why we cannot accept the district court's grant of summary judgment. The stakes in this case are too great not only for the lawyers and court personnel but also for the

---

**15.** The appellees did file an opposition to the appellants' motion which specifically contested some of the appellants' asserted facts, but in that opposition they stated:

Although this [the district] court's order does not expressly permit further briefing and the cross motions for summary judgment in effect serve as oppositions to each other, certain inaccuracies contained in plaintiffs' motion for summary judgment do require a brief reply.

Defendants' Opposition and Reply to Plaintiffs' Motion for Summary Judgment, at 1.

**16.** The appellants' Points and Authorities in Opposition to Defendants' Motion for Summary Judgment is replete with factual allegations and arguments that contest the material facts set out in the appellees' motion. *See, e.g., id.* at 1 ("[Mr. Sitomer's] statements concerning waiting time have been thoroughly misunderstood both by that [the Superior] Court and by the Corporation Counsel"); *id.* at 2 (defendants' assertions "that neglect cases are 'inherently factual,' 'do not require substantial

amounts of legal research and investigative efforts,' and 'do not require appointed counsel to incur out of pocket expenses in representing parents,' ... would be different if the attorneys were reasonably compensated or had funds available for experts and investigation"); *id.* at 3 (cases "frequently require testimony from experts in internal medicine, psychiatry, and psychology, and, if fought more aggressively, from economists as well"); *id.* ("between reviews ... the attorney can be working to secure return of the child, or, ... for ending court supervision, by trying to remedy the problems that brought about court intervention in the first place"); *id.* at 5 ("[h]ad each attorney in the plaintiffs' class been given just one case this case would very likely not be here"); *id.* at 9 ("we have not had the discovery needed to gather information necessary to fix an amount that would be adequate ... to remove the onus of unconstitutionality [of neglect proceeding appointments]").

parents and children involved in neglect cases to let stand a judgment mistakenly entered without any judicial inquiry upon "facts"—that representation of parents in neglect cases entails minimum time and effort and need exact no substantial premium in time or talent from legal advocates— which are widely perceived in the local bar and in the community at large, not to be true, and which have been the core of a decade-old controversy.[17] Such a judicial affirmation made without an adequate inquiry into these facts' truth or falsity would, we fear, invite disrespect of the courts and undermine the credibility of their procedures. As illustrative of the intensity and the high visibility of the controversy, we note a D.C. Bar report in which the present appointment system's inability to guarantee adequate representation to parents or adequate compensation to assigned lawyers is highlighted.[18] Since professional standards for adequate representation of parents in neglect and termination proceedings obviously require a great deal more than the token representation that the district court assumed neglect cases de-

mand,[19] we do not think it proper for us to dismiss a constitutional claim on the ground that such efforts are all that is called for from assigned counsel. Too much is at stake for too many.

In short, the district court based its dismissal of the "takings" claim specifically on a finding that the burden was not a heavy one; we remand for a more complete record on the precise extent of the burden as those services are currently performed and as they should be performed under adequate professional standards, as well as on the status of Family Division attorneys' expectations of carrying on practice in the Division and their need to rely on government compensated cases to do so.

## C. The Equal Protection Claim

The district court found that the decision to restrict *pro bono* appointments to lawyers hoping to receive CJA-compensated appointments was rational and it therefore dismissed this claim. We agree that the appellants' right to earn a living as lawyers is not so fundamental that

---

**17.** *See* Bruske, *Neglect of Children Often Extends to D.C. Courts,* Washington Post, Dec. 4, 1983, at A1, col. 2.

**18.** The Court System Study Committee noted:

The system for parental representation is shameful and inexcusable. Counsel for parents are *drafted* on an involuntary basis from the pool of attorneys who pick up juvenile and PINS cases under the CJA program. Drafted attorneys are required to take uncompensated neglect cases as a precondition to receiving Criminal Justice Act fee generating juvenile delinquency appointments, which in many cases provide the attorneys' livelihood. There are only one hundred attorneys and some 600 neglect cases are petitioned each year. A number of these cases have two parents each requiring separate counsel. As these cases stay in the system for years, many attorneys have very high neglect caseloads. The result of this situation is that the quality of representation of parents is very low although the societal cost and the stakes for all concerned are higher than for many criminal cases for which paid counsel is available. Additionally, the Courtroom hearing calendars back up because of the conflicing [sic] schedules of the attorneys. One-third to one-half of the continu-

ances in neglect cases are granted at the request of the defense attorney. The Court Study Committee finds no justification for continuing this system of inadequate representation.

Neglect Report, *supra* note 14, at 36 (emphasis in original) (footnote omitted).

**19.** *Compare Family Division Trial Lawyers,* slip op. at 7 ("[n]eglect cases do not usually require substantial research and investigation efforts") *with Lassiter,* 452 U.S. at 30, 101 S.Ct. at 2161 ("the ultimate issues with which a termination hearing deals are not always simple, however commonplace they may be. Expert medical and psychiatric testimony ... is sometimes presented") *and* Neglect Report, *supra* note 14, at 163 ("[n]eglect cases are the most difficult of Family Division cases. The nature of the problems, the conditions of the clients, the inefficiency and insensitivity of many Department of Human Services workers, and the complexity of the legal issues should require expending vast amounts of time by the attorneys") *and* Report of Committee on Appointment of Counsel to Indigent Cases 9 (Apr. 4, 1979) ("[child advocacy] cases often involve several social agencies with whom the attorneys must confer .... Lengthy hearings in addition to a trial are often required and post-trial involvement continues until the files are closed").

it triggers strict judicial scrutiny of the challenged system; if the system reflects a rational choice aimed at furthering legitimate state interests, a court must uphold it. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 461–64, 101 S.Ct. 715, 722–23, 66 L.Ed.2d 659 (1981); *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 174–76, 101 S.Ct. 453, 459–60, 66 L.Ed.2d 368 (1980). We also agree that the district court properly identified the state interest furthered by the appointment system as the guarantee of adequate representation for children and parents in neglect proceedings. But, we cannot conclude, based on the factual record developed thus far, that the District's choice to implement the system as it did—in particular its choice to restrict *pro bono* appointments to attorneys on the Public Defender Services list for CJA appointments in juvenile cases—was rational.

Arguments that the District acted rationally in presuming that lawyers who regularly practice before the Family Division are best able to represent parents in neglect proceedings, and in requiring more from recipients of the public fisc than from other attorneys, bring us no more than to the halfway mark in analyzing the appellants' equal protection claim. At some point, even initially rationally motivated restrictions on the pool of attorneys assigned *pro bono* cases may result in such enormous demands on the time and energy of these appointed attorneys that they cease to be rational either in the results they engender of ineffective representation for indigent parents, or the burdens they impose on the chosen attorneys: [20] For example, to require the one most experienced neglect lawyer in the local bar to take on all *pro bono* assignments would surely not survive even a rational means test. It is by no means clear from the sparse record before us

whether this point has been reached or even approached. Since the constitutional claim at issue is the discriminatory application of the system, not just its design, further fact-finding is required.

We realize that since the appellants filed their complaint, the District has begun to pay small but not insignificant sums for representation of indigent parents in neglect proceedings.[21] This new factor could alter any assessment of the effects of restricting the pool of attorneys who are assigned *pro bono* neglect cases. But, as with the "takings" issue, we remand for a more accurate assessment of the extent of the remaining burden on the appellants—to see if the classification meets the rational means test.

We emphasize that our remand is only to permit the district court to decide on a fuller record the constitutional issues involved in the application of the assigned counsel system—to elucidate the extent of the burden currently falling on family lawyer practitioners, as well as what that burden would be if they performed their chores in accordance with professional standards. Administration of the local court system is a province we enter hesitantly. We are all too aware of the financial dilemma that the local court system faces in trying to provide assigned counsel for indigent litigants. We assume a great deal of deference must be given to its attempts to keep the system afloat without violating the constitutional and statutory rights of children, parents, or lawyers. At this juncture, however, we feel compelled, as did the district court, to entertain the constitutional claims of the allegedly aggrieved lawyers. Right now, we merely require that a first cut on their claims be made on an adequate record. In the event that any of those claims are upheld, we expect much deference by the district court and much participation by the

20. A recent Washington Post article points out that despite constitutional guarantees, many children in the District's custody are unrepresented by counsel when determinations about their continued placement is made. *See* Bruske, *supra* note 17. The article also suggests that lack of representation may result in

longer placements in the District's custody, which translates into higher costs to the District than would result if paid representation were provided. *Id.* at A12, col. 1.

21. *See* Letter from the Honorable Gladys Kessler, *supra,* n. 4.

local judiciary in formulating an equitable remedy.

## CONCLUSION

For the reasons set out above, we reverse the decision of the district court in part, affirm it in part, and remand this case for further proceedings.

*It is so ordered.*

STARR, Circuit Judge, dissenting:

I respectfully dissent. In my view the District Court was entirely correct in granting summary judgment in this case. The majority's ruling mandates further proceedings on constitutional claims that, as a matter of law, should be and properly were rejected. Moreover, the court's ruling inappropriately erodes the stringent adherence to District Court Local Rule 1–9(h) required under this court's rulings in *Gardels v. CIA*, 637 F.2d 770, 773 (D.C.Cir.1980) and *Tarpley v. Greene*, 684 F.2d 1, 6–7 (D.C.Cir.1982).

As fully recounted by the majority opinion, this suit was brought against the Chief Judge of the Superior Court of the District of Columbia, the Public Defender Service, and the District of Columbia, alleging that the Family Division appointment process violates the thirteenth amendment's prohibition against involuntary servitude, the fifth amendment's prohibition against the taking of private property without just compensation, and the equal protection component of the fifth amendment. The district court granted summary judgment in favor of the defendants, rejecting appellants' thirteenth and fifth amendment claims and holding that the system of attorney appointments "does not so burden the CJA attorneys that it amounts to a consti-

tutional violation."[1] Memorandum Opinion at 8. The district court also rejected appellants' equal protection claims, holding that selecting attorneys who regularly practice before the Family Division to represent indigent parents in Family Division neglect cases is "entirely rational." *Id.* at 10.

In my view, the majority errs in two respects.[2] First, as a matter of law, appellants' thirteenth amendment, fifth amendment, and equal protection claims are utterly without merit. Second, even assuming, as I do not, that burdensomeness is a relevant inquiry as to the due process claim, appellants nonetheless failed to raise a genuine issue concerning the alleged burdensomeness of the appointments.

## I.

It is, of course, elementary that summary judgment should be granted only if there is no genuine issue as to any material fact and if the moving party is entitled to prevail as a matter of law. Fed.R.Civ.P. 56(c); *Thompson v. Evening Star Newspaper Co.*, 394 F.2d 774, 776–77 (D.C.Cir.), *cert. denied*, 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160 (1968). When a party has properly pleaded and supported a motion for summary judgment under Rule 56(e), the opposing party must set forth specific facts showing that a genuine issue of material fact exists. *See Tarpley v. Greene*, 684 F.2d 1, 6 (D.C.Cir. 1982); *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1054 n. 7 (D.C.Cir.1981). In addition to the requirements of Rule 56, the District Court's Local Rule 1–9(h) requires the party opposing the motion to file a "concise statement of genuine issues" setting forth all material facts

1. The district court also concluded that the fact that the court appoints counsel for some nonindigent parents did not affect this result. Memorandum Opinion at 5–6. The court reasoned that the superior court's Neglect Rule 20(b) and D.C.Code § 16–2326 (1981) provide avenues of relief for attorneys that are appointed to represent parents that the court later determines are not indigent. *Id.*

2. I agree fully with the majority that the District Court properly refused, under the specific

circumstances of this case, to abstain from deciding the federal constitutional issue. Unlike *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its civil progeny, in this case there was no pending proceeding in the District of Columbia courts. Moreover, as the majority correctly observes, any remedial order would not, as in *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), impinge upon the day-to-day operations of the superior court.

as to which it is contended there are genuine issues. Local Rule 1–9(h) further provides that the court "may assume that the facts as claimed by the moving party in his statement . . . are admitted to exist except to the extent that they are controverted in a statement filed in opposition to the motion." This court has enforced this requirement stringently, stating that failure to file a proper Rule 1–9(h) statement "may be fatal to the delinquent party's position." *Gardels v. CIA,* 637 F.2d at 771, 773 (D.C. Cir.1980); *Tarpley v. Greene,* 684 F.2d at 6–7 & n. 15. *See also* 10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2719, at 12–13 (2d ed. 1983) (local rules requiring filing of statements of genuine issues are more demanding than Rule 56). It is within this undisputed procedural framework that this case, properly analyzed, should be decided.

## A. *Thirteenth Amendment Claims*

Appellants claim that the appointment system imposes involuntary servitude upon them in violation of the thirteenth amendment. They reason that because the bulk of their practice consists of compensated juvenile appointment cases, they are coerced into accepting the uncompensated neglect appointment cases in contravention of the thirteenth amendment.

As the majority correctly concludes, the uncontroverted facts of this case demonstrate that this claim is unmeritorious. First, appellants, by their own admission, are not *compelled* to place themselves on the list for compensated juvenile cases that subjects them to uncompensated neglect appointments. Involuntary servitude, in contrast, exists only when the individual is unable to avoid continued service. *See Flood v. Kuhn,* 316 F.Supp. 271, 280–81 (S.D.N.Y.1970), *aff'd,* 443 F.2d 264, 268 (2d Cir.1971), *aff'd on other grounds,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); *Wicks v. Southern Pacific Co.,* 231 F.2d 130, 138 (9th Cir.1956). The attorneys here are free to stop practicing before the Family Division or to continue practicing without taking compensated juvenile cases. *See*

*Flood v. Kuhn,* 316 F.Supp. at 281. Second, compelling an individual to perform traditional types of public service does not constitute an imposition of involuntary servitude. *See Hurtado v. United States,* 410 U.S. 578 n. 11, 93 S.Ct. 1157 n. 11, 35 L.Ed.2d 508 (1973) (requirement that prisoners serve as witnesses in trial without compensation constitutes public duty and does not constitute involuntary servitude); *cf. Powell v. Alabama,* 287 U.S. 45, 73, 53 S.Ct. 55, 65, 77 L.Ed. 158 (1932) (attorneys are officers of the court and are duty bound to accept appointments to represent indigents charged with capital offenses). Thus, even if appellants were compelled to accept appointments, that service would not amount, under settled law, to involuntary servitude. *See Williamson v. Vardeman,* 674 F.2d 1211, 1214 (8th Cir.1982) (thirteenth amendment has never been applied to various forms of public service and does not apply to uncompensated appointments an attorney may be required to take). To this extent, I fully agree with the majority opinion. As we move, however, from what I deem to be the patently frivolous thirteenth amendment claim to the due process and equal protection contentions, I am constrained to part company with the majority.

## B. *"Taking" Claims*

The district court held that appellants have suffered no "taking" of their services without compensation in violation of the fifth amendment. Appellants' primary contention in this regard is that the uncompensated neglect appointments either have reached or could reach a level of burdensomeness that would amount to a taking cognizable under the fifth amendment. They argue that the district court improperly granted summary judgment on this issue because their Rule 1–9(h) statement set forth the number of uncompensated cases each individual attorney had been required to accept over the years, thus giving rise to a genuine issue of material fact on the issue of burdensomeness. Despite this argument, the district court properly granted summary judgment on this fifth amendment claim.

### 1. The Majority's Theory of "Taking"

In my view, the burdensomeness of the uncompensated appointments is not material to determining whether a taking has occurred in this case. This case, unlike the cases relied upon by appellants and the authorities cited by the majority, does not involve conditioning the practice of law on the acceptance of uncompensated appointed cases. Indeed, a majority of the cases dealing with such requirements have squarely held that requiring counsel to serve without compensation *as a condition of being permitted to practice law* does not constitute a taking. *See, e.g., Williamson v. Vardeman,* 674 F.2d 1211, 1214–15 (8th Cir.1982); *United States v. Dillon,* 346 F.2d 633, 635 (9th Cir.1965), *cert. denied,* 382 U.S. 978, 86 S.Ct. 550, 15 L.Ed.2d 469 (1966); *Jackson v. State,* 413 P.2d 488, 489–90 (Alaska 1966); *MacKenzie v. Hillsborough County,* 288 So.2d 200, 201 (Fla.1973); *Weiner v. Fulton County,* 133 Ga.App. 343, 148 S.E.2d 143, 147 (Ga.), *cert. denied,* 385 U.S. 958, 87 S.Ct. 393, 17 L.Ed.2d 304 (1966); *In re Meizlish,* 387 Mich. 228, 196 N.W.2d 129, 134–35 (Mich.1972); *State v. Rush,* 46 N.J. 399, 217 A.2d 441, 446 (N.J.1966).[3] These cases reason, correctly, that the uncompensated representation of individuals in need constitutes an attorney's duty as an officer of the court. *See Williamson v. Vardeman, supra,* 674 F.2d at 1214–15. Some courts have, to be sure, relaxed this absolute obligation, reasoning that although requiring an attorney to accept uncompensated cases as a condition of practicing law does not normally violate due process, the level of appointments may rise to the level of a taking when an attorney is substantially impaired in his ability to engage in remunerative practice. *See People ex rel. Conn v. Randolph,* 35 Ill.2d 34, 219 N.E.2d 337, 341 (Ill.1966); *Bradshaw v. Ball,* 487 S.W.2d 294, 295, 297–98 (Ct.App.Ky.1972); *State v. Green,* 470 S.W.2d 571, 572–73 (Mo.1971) (*en banc*); *Honore v. Washington State Board of Prison Terms,* 77 Wash.2d 660, 466 P.2d 485, 496–97 (1970) (*en banc*); *State ex rel. Partain v. Oakley,* 227 S.E.2d 314, 318 (W.Va.1976).

Although appellants contend, and the majority now holds, that they should be permitted to prove that the Family Division appointments have risen to this level of burdensomeness, this analysis is, in my judgment, inapposite inasmuch as appellants, unlike the attorneys in all of the cases in which a taking has been found, have in no wise been drafted to perform such services. By accepting compensated juvenile cases, appellants agreed each and every month to accept uncompensated neglect cases as well. Only by their voluntarily seeking compensated cases were they then required to take on uncompensated cases. Moreover, appellants made no claim that they were required to continue uncompensated representations in the face of a request to withdraw. As a matter of law, I would conclude that no level of burdensomeness could rise to the level of a taking as long as appellants have volunteered their services. In short, the element of voluntariness, which the majority fully concedes is present in this case, vitiates any fifth amendment claim of taking just as it does the even more far-fetched claim of involuntary servitude under the thirteenth amendment.

Although the majority concedes that "proving a taking in a situation like this one is obviously a formidable task," its outline of the circumstances that would have to be shown in this case reveals that the appellants' task is not only formidable but impossible. The majority states that appellants would have to demonstrate, on remand, that the attorney's "expectations of pursuing a specialty practice before the Family Division are sufficiently established within the norms and traditions of legal practice to constitute a property interest." Majority Op. at 707. It would be easier for the proverbial camel to pass through the

---

**3.** In a minority of jurisdictions, requiring an attorney to accept uncompensated appointments as a condition of granting a license to practice law has been considered a taking.

*See, e.g., State v. Bell,* 244 Ind. 701, 195 N.E.2d 464, 466 (1964); *Bedford v. Salt Lake County,* 22 Utah 2d 12, 447 P.2d 193, 195 (1968).

eye of a needle than to satisfy this fanciful standard.

First, the notion that an attorney can have a property right in pursuing a *specialty* practice, as opposed to a property right in pursuing his *profession,* is completely without precedent. It should thus be emphatically clear that the majority has departed completely from the precincts of prior decisional law. *See supra* p. 713 (citing cases discussing attorneys' property right in pursuing profession). Second, even assuming that precedential support for the majority's notion exists, the majority fails to take into account the fact that the system involved here in no way prevents these attorneys from pursuing a specialty practice in the Family Division. To the contrary, only those attorneys who seek compensation from the public are even governed by the system at issue here. Finally, matters handled by the Family Division include not only child neglect and intrafamily disputes, but also juvenile matters, domestic relations, and mental health matters. *See* 1982 ANNUAL REPORT OF THE DISTRICT OF COLUMBIA COURTS 68. The majority therefore considers far too narrow a proportion of the types of cases encompassed by Family Division practice in suggesting that the number of compensated cases may be "so small that withdrawing from the market of government compensated cases would effectively be a decision to withdraw from practice before the Family Division." In sum, I do not believe there is any legal basis for the majority's theory that the District of Columbia is putting Family Division lawyers to a Hobson's choice of either not working or working under such a great burden as to amount to a taking.

More fundamentally, this court recently has repudiated the approach advocated by the majority in defining property under the taking clause of the fifth amendment. In *Kizas v. Webster,* 707 F.2d 524 (D.C.Cir. 1983), this court rejected a claim by FBI employees that special preferences for a training program could give rise to a property right. *Id.* at 539–40. In that case, the plaintiffs attempted to analogize their interest in the benefits of the training program to a property interest such as that protected from deprivation without due process procedures. *Id.* at 538–39. Judge Bazelon, writing for the court, squarely rejected the notion that "a claim of deprivation of property, without due process of law [can] be blended as one and the same with the claim that property has been *taken* for public use without just compensation." *Id.* at 539 (emphasis in original). Yet, the majority premises the possibility of appellants' taking claim on the same erroneous analogy by seeking to import Family Division attorneys' expectations of practicing before the Family Division into its analysis of property protected by the taking clause.

2. Standards for Granting Summary Judgment

But assuming *arguendo* that the burdensomeness analysis is apposite, appellants nonetheless failed to demonstrate the presence of a genuine issue of material fact. As the district court correctly stated, "[n]othing in the record supports an allegation that 'great personal hardship and sacrifice has been imposed upon' Plaintiffs by their appointment to neglect cases." Memorandum Opinion at 7. Appellants failed to contest the appellees' statements in their Rule 1–9(h) statement that neglect cases do not involve substantial research or investigation and that the burden imposed by such appointments neither impairs the attorneys' ability to engage in remunerative practice nor results in substantial out-of-pocket expenditures. Thus, under the well-established law of this circuit—which the majority does not question but chooses to ignore— the district court properly assumed the truth of those statements and, accordingly, granted summary judgment for the appellees. *See Tarpley v. Greene,* 684 F.2d 1, 6–7 (D.C.Cir.1982); *Gardels v. CIA,* 637 F.2d 770, 773 (D.C.Cir.1980). As this court stated in *Gardels,* the failure to challenge statements contained in a Rule 1–9(h) statement may be fatal to the delinquent party. 637 F.2d at 773. The majority, by reversing the district court's grant of summary judgment,

has failed to adhere to this court's admonishments that the requirements of Rule 1–9(h) be strictly enforced.

### C. *Equal Protection Claims*

Finally, the district court correctly granted summary judgment on appellants' claims that the appointment system violates the equal protection component of the fifth amendment.[4] Economic classifications such as those at issue here merit, under settled authority, only the mildest standard of review. *Craig v. Boren,* 429 U.S. 190, 207, 97 S.Ct. 451, 462, 50 L.Ed.2d 397 (1976); *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). The classifications at issue here distinguish between lawyers who are compensated by public funds for Family Division appointments and those who are not; they also distinguish between those who are plainly and indisputably familiar with practice and procedure in the Family Division and those who are not. Each of these classifications bears a reasonable relation to legitimate governmental interests. *See United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 174–75, 101 S.Ct. 453, 459–60, 66 L.Ed.2d 368 (1980); *Dandridge v. Williams,* 397 U.S. 471, 483–86, 90 S.Ct. 1153, 1160–62, 25 L.Ed.2d 491 (1970). The District of Columbia clearly has a legitimate interest in providing counsel to indigent parents in child neglect cases. A classification resulting in the selection of attorneys familiar with Family Division practice and who have voluntarily sought compensated appointments by placing their names on the Family Division's list each month is an entirely rational means of furthering this interest. In sum, on the undisputed facts of this case, appellants have not made out an equal protection violation.[5]

### II.

There is undoubtedly genuine wisdom in much of the majority's expressions of concern and reservation about the Family Division appointments system at issue in this case. The appointments system may indeed be one crying out for reform, as the majority goes to some lengths to suggest in the latter part of its opinion. It is perhaps unenlightened and unsound public policy to perpetuate a system which results in cases arguably being given short shrift, as stated by the District of Columbia Bar Report on which the majority relies. But whatever discomfort on our part may reasonably attend the continuation of a system which treats such highly sensitive and important issues of family relations, that discomfort does not warrant a strained solicitousness for bizarre constitutional claims advanced by self-interested lawyers who could promptly opt out of the system they decry.

Our mission is not, under the guise of entertaining constitutionally based claims for attorneys' fees, to constitute ourselves as a Council on Judicial Reform. It is, in my judgment, cases such as this, where a request for reform comes clothed in constitutional garb, that to an unfortunate degree render the increasing workload of the federal judiciary a proximate result of the judiciary's own imaginative handiwork.

I respectfully dissent.

---

4. Equal protection concepts, as the majority correctly notes, are inherent in the fifth amendment's due process guarantee. *See Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975); *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Washington v. United States,* 401 F.2d 915, 922 (D.C.Cir.1968). Equal protection analysis under the fifth amendment follows that under the fourteenth amendment. *Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976).

5. Appellants also claim that the district court erred in not finding an equal protection violation because the system discriminates between attorneys who are appointed to represent children and those who are appointed to represent parents in that only attorneys who are appointed to represent children receive compensation. Appellants' Brief at 19. As appellants concede, however, the existence of such a disparity was not brought to the district court's attention and thus may not properly be considered by this court.